Filed 1/3/25  P. v. Walters CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VINCENT LEGREND WALTERS,<br><br>    Defendant and Appellant. | D083086<br><br><br>(Super. Ct. No. SCD260844) |

APPEAL from an order of the Superior Court of San Diego County, Theodore M. Weathers, Judge.  Affirmed.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher B. Beesley, and Namita Patel, Deputy Attorneys General, for Plaintiff and Respondent.

In October 2015, Vincent Legrend Walters agreed to a plea agreement whereby he pleaded guilty to first degree murder (Pen. Code,[1] § 187, subd. (a)) and two counts of kidnapping for ransom (§ 209, subd. (a)). The court sentenced Walters to prison for 32 years to life.

In 2021, Walters filed a resentencing petition under section 1172.6. The trial court denied the petition at the prima facie stage, but on appeal, this court reversed, concluding that there was a factual question as to Walter's liability for murder. We therefore remanded the matter to the trial court with directions to issue an order to show cause and hold an evidentiary hearing.

After holding an evidentiary hearing on Walter's resentencing petition, the trial court denied the petition. In doing so, the court found that the prosecutor had proven beyond a reasonable doubt that Walters was guilty of first degree murder as the actual killer, an aider and abettor with the intent to kill, or a major participant with reckless disregard for the victim's life.

Walters appeals, contending insufficient evidence supported the trial court's findings. Specifically, Walters notes that the prosecution did not present sufficient corroboration for accomplice testimony on which the court relied to find Walters guilty. In the alternative, he asserts that even if we conclude that the accomplice's testimony was corroborated, substantial evidence does not support the trial court's findings. We are not persuaded and affirm the order denying Walters's resentencing petition.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

FACTUAL BACKGROUND[2]

*Prosecution*

In 1988, Daniel J.[3] and his girlfriend lived with Steven B. on Vance Street. Walters, his brother Martin, and Michael M.[4] knew Steven and manufactured methamphetamine in his garage.

On Friday, September 23, 1988, Steven gave Daniel about two pounds of methamphetamines and asked him to hold the drugs until the next day. Although he originally put the drugs in his girlfriend's car, Daniel did not want to leave them there so he asked his friend Jay B. to hold onto them until he asked for them back.

Jay did not immediately return the drugs when Daniel repeatedly asked for them. Daniel traveled to Jay's house to obtain the drugs, but Jay pointed a gun at Daniel and told him to leave.

On Sunday, upon Martin's direction, Walters found Daniel, held a screwdriver to his neck, and kidnapped him with Steven's assistance. They transported Daniel to an apartment in Chula Vista, where they met their cohorts, who included Michael M., Glenn A., and Juan L. Walters took Daniel to a bedroom within the house. The captors periodically pointed various guns at Daniel and told him to get their drugs.

Daniel informed his captors that he had seen Jay at their friend Michael P.'s house. They took Daniel there, with the agreement that if the

---

[2] During the evidentiary hearing, the trial court accepted a joint motion by the parties to admit Court's Exhibit 1, consisting of the preliminary hearing transcripts, the clerk's transcript, and the transcript of Walters's change of plea. Walters's brother, Martin, testified at the hearing.

[3] Daniel testified under a grant of use and transactional immunity.

[4] Michael M. testified subject to a cooperation agreement for a lighter sentence.

3

people in the house were uncooperative, they would be abducted. While two cohorts waited outside, Walters and the others went with Daniel into the house where they found Michael P. and his girlfriend, Kristine R. Jay was not there and Michael P. was unable to tell them where he was. The group, armed with multiple guns, ordered Michael P., Kristine, and Daniel to recover the methamphetamine. When Kristine, Michael P., and Daniel could not, Juan abducted Kristine, while the others took Michael P. and Daniel to Steven's house. Walters ordered Michael P. and Daniel to stay in the bedroom.

Over the course of a few days, Walters and his fellow captors held Michael P. and Daniel confined in the bedroom at gunpoint with the understanding that they would not be released until the methamphetamine was returned. In that time, Walters and his cohorts took Michael P. and Daniel to other locations occasionally for short periods but returned to the same bedroom at Steven's house.

On Monday evening, Michael P. inquired about Kristine and asked if he could speak with her. Walters agreed, but he and his cohorts were armed as they stood over Michael P. during the phone call. Later that evening, Daniel overheard his captors talk about killing him and Michael P.

That same evening, Steven and Michael P. recovered the methamphetamine from Jay. But some was missing. The group formed a plan to recover the rest.

Daniel and Michael P. remained at the house until Wednesday. Despite multiple attempts on Tuesday and Wednesday, Michael P. was unable to get information regarding Kristine's whereabouts or welfare.

On Wednesday morning, Walters and his cohorts decided to kill their hostages. Although most of the narcotics had been returned, the group

4

believed that Kristine, Michael P., and Daniel knew too much and needed to be eliminated. Walters and his cohorts retrieved Kristine from Juan and drove to an address on Euclid Street in El Cajon. Martin was prepared with carbon tetrachloride and chloroform.

At the house, some of the cohorts opened windows, presumably to dissipate fumes and odors from the poison they were about to administer to Kristine. They then left Walters and Martin at the house with Kristine. As Walters and Martin tried to subdue Kristine with the poison, she struggled and fought back, splitting Walters's lip before finally succumbing. When the cohorts returned, Walters's lip was bloody and swollen. He recounted Kristine' struggle and death. After hearing about Kristine's death, the group closed up the house and left.

Meanwhile, Michael P. and Daniel escaped. Within a few days, Walters and his cohorts fled to Mexico. Eventually, Michael M. and Martin returned to San Diego intent on locating and killing Michael P. and Daniel. They failed and police arrested Michael M. soon after.

Police eventually recovered Kristine's body. The cause of her death was acute carbon tetrachloride poisoning.

The prosecution also offered evidence of Walters's guilty plea, which occurred on October 5, 2015. At the time of the plea, the trial court asked Walters, "Did you murder Kristine . . .?" Walters responded in the affirmative. The court then asked Walters if he killed her, and Walters replied, "Yes, I did." However, his counsel interjected, "It's aiding and abetting." The court replied, "By what he said is enough." Counsel offered, "I want to make sure it's clear."

The prosecution and the trial court then prompted Walters to admit the murder was "willful, deliberate and premeditated." Walters responded, "If

5

that's the definition, yes, I do."  The court then asked, "That's truly in this case, it was willful, premeditated?"  Walters replied, "Yes, it is."

Walters's written plea form stated that he "aided and abetted" Kristine's murder.  In addition, on that form, the words "deliberate and premeditated" were crossed out and the words "first degree" were handwritten above them.

### Defense

Martin was the only witness called at the evidentiary hearing.  He testified as follows:  Since February of 1988, Martin was involved with Walters and the others in the manufacturing of Desoxyn, a drug associated with methamphetamine.  In September of 1988, Martin set up a manufacturing lab in Steven's home, and Walters and Micheal were his employees.  He confirmed that Steven had given two pounds of methamphetamines to someone outside the group.

Martin learned that Jay ended up with the methamphetamine and refused to return it, threatening members of the group with a gun when they tried to retrieve the drugs from him.  Martin and the group (consisting of Walters, Daniel, Michael M., Glenn, and Steven) devised a plan to recover the methamphetamine.

They went to Jay's apartment to look for him.  Unable to locate him, they eventually decided to check Michael P.'s house to see if he was there.

When the group confronted Michael P., he told them, "Get the fuck out of here."  Martin directed Michael P. and Kristine to call Jay, but they could not reach him.  He also went into the back room of the house and found children there.  Martin gave Michael P. and Kristine a choice to either wait together at this house or go with the group.  Because there were children in the house, Michael P. and Kristine decided to go with Martin voluntarily.

Juan took Kristine to his apartment where he held her captive. Walters, Martin, and the others took Michael P. and held him at Steven's house.

On Tuesday, Walters called Martin and said that he was tired of the situation and to let the hostages go. Martin agreed but was angry because Jay kept telling him that he would show up with the drugs but failed to do so. Until this point, Walters had stayed with Daniel. He updated Martin about the status of meetings scheduled with Jay.

At some point, Martin learned that the missing methamphetamine was returned. Michael P. and Kristine seemed to be a part of Jay's deception.

On Wednesday, Jay threatened to kill Martin. Martin told Jay to watch what he said because Martin would kill him. Jay continued to threaten Martin. However, Martin denied having a conversation with Michael M., Juan, and Walters wherein it was decided that Kristine had to be killed because she had seen too much. Martin also denied having discussed killing Micheal P. or Daniel.

Martin had rented a house on Euclid Street to manufacture methamphetamine and stored related chemicals there. He decided Kristine should be brought there to be interrogated. After she arrived, she told Martin that she and Jay were going to kill him. At that point, he decided to kill Kristine.

Martin admitted he murdered Kristine with poison. He laid her down in the back bedroom, soaked a pillow and a rag with carbon tetrachloride to put her to sleep, held her by the throat and arm, put the rag to her face, and she died. He had to hold Kristine down because she was convulsing and fighting back once the poison was applied. Martin claimed that neither Walters nor the others knew he was going to kill Kristine. He asserted that they stood outside during the killing.

Afterwards, Martin cleaned up the lab, put Kristine's body in the closet, and took all the equipment out. At some point after her death, Martin planned to kill Jay, who he blamed for the entire situation. After he left the house, Martin destroyed his equipment and put it in a dumpster. Walters and the others left when Martin explained that he had killed Kristine. He advised everyone to leave the county because he was worried about getting in trouble and that Jay could shoot them. Martin gave Walters and the others money to go to Mexico. Martin stayed to look for Jay. At some point, he also went to Mexico.

On October 21, 1988, Martin was arrested for gun charges from a previous case. He was charged with Kristine's murder. He pleaded guilty because he was the actual killer and was concerned about prosecutions intended for his mother and aunt. He served 32 years in state prison and was out of custody at the time of his testimony.

On cross-examination, Martin denied meeting with his co-conspirators and deciding with them that Kristine needed to die. He further denied any plans to kill Michael P. or Daniel. He agreed that Walters and the others brought Kristine to the house on Euclid per his directions. He admitted that Walters had not been injured upon his arrival to the Euclid house.

Martin denied Walters's involvement in subduing and murdering Kristine. He also rejected that Walters had sustained a "busted lip" during Kristine's struggle. Instead, Martin claimed that Kristine willingly laid down on the chemical soaked pillow for approximately 20 to 25 minutes until she was "knocked out" and then he placed the chemical soaked rag over her mouth, killing her without a struggle. Martin insisted he cleaned up the lab without any help. He also claimed to put Kristine's body into the closet

8

alone.  With Kristine dead, Martin told Walters and the others that they no longer needed to locate and transport Michael P.

Martin confirmed that Walters remained in Mexico for about 22 years before prosecution.  Martin emphasized that he was the killer but also admitted that he had a bias in that he wanted to aid his brother in getting out of custody.

## DISCUSSION

### A.  The Section 1172.6 Process

Senate Bill No. 1437 (Senate Bill 1437) was enacted to " 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 846−847 (*Gentile*); Stats. 2018, ch. 1015, § 1, subd. (f).)  To effectuate this purpose, "Senate Bill 1437 added three separate provisions to the Penal Code.  First, to amend the felony murder rule, Senate Bill 1437 added section 189, subdivision (e):  'A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' " (*Gentile*, at p. 842.)

9

"Second, to amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3) . . . : 'Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime.' " (*Gentile*, *supra*, 10 Cal.5th at pp. 842–843.)

"Third, Senate Bill 1437 added section [1172.6] to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief under the two ameliorative provisions above." (*Gentile*, *supra*, 10 Cal.5th at p. 843.)

The section 1172.6 petition process "begins with the filing of a petition containing a declaration that all requirements for eligibility are met [citation], including that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to [Penal Code] Section 188 or 189 made effective January 1, 2019,' the effective date of Senate Bill 1437 (§ 1172.6, subd. (a)(3))." (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).) "When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' " (*Ibid*.) If the petitioner "has made a prima facie showing of entitlement to relief, 'the court shall issue an order to show cause.' (§ 1172.6, subd. (c).)" (*Strong*, at p. 708.)

Once an order to show cause has issued, the court must hold an evidentiary hearing to determine whether to vacate the murder conviction. (§ 1172.6, subd. (d)(1); see *Strong*, *supra*, 13 Cal.5th at p. 709.) At the evidentiary hearing, the burden is "on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder" under California

10

law as amended by the changes to sections 188 and 189 by Senate Bill 1437. (§ 1172.6, subd. (d)(3).) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

At an evidentiary hearing under section 1172.6, subdivision (d)(3), "the superior court acts as an independent fact finder and determines whether the People have met their burden in proving the defendant guilty of murder" under the amendments to the Penal Code made by Senate Bill 1473. (*People v. Henley* (2022) 85 Cal.App.5th 1003, 1016.) "A trial court's factual findings at a section 1172.6, subdivision (d)(3), hearing are reviewed for substantial evidence. [Citations.] Under this standard, the record is reviewed ' " 'in the light most favorable to the judgment' " ' and a reviewing court decides ' " 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' [Citation.] '[W]e look to whether the prosecution has introduced sufficient evidence of " ' "reasonable, credible, and of solid value" ' " to "support a finding beyond a reasonable doubt" ' that petitioner was guilty." (*Henley*, at p. 1017.)

## B. Walters's Contentions

Below, the trial court determined that Walters was not entitled to resentencing under section 1172.6. To this end, the court concluded that Walters was the actual killer when he acted in concert with Martin to kill Kristine. It also determined that Walters acted as a direct aider and abettor in the murder, noting Walters harbored the specific intent to kill, conspired with his brother to kill, and ultimately assisted his brother in the actual killing. Finally, the court found that Walters was guilty under a felony

11

murder theory because he was a major participant in the underlying kidnapping for ransom and acted with reckless indifference to human life.

Walters contends that the trial court's findings are not supported by substantial evidence. Specifically, he argues that the prosecutor failed to present sufficient corroboration for the accomplice's testimony on which the court relied. Additionally, he maintains that even if we determine that his guilty plea was sufficient to corroborate the accomplice's testimony, the evidence submitted was still insufficient to show that he acted with malice in Kristine's death or that he was a major participant who acted with reckless indifference to human life.

### C. Corroboration of Accomplice Testimony

An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) The testimony of accomplices must be corroborated by "such other evidence as shall tend to connect the defendant with the commission of the offense." (*Ibid*.) This evidence may not come from or require " 'aid or assistance' " from, the testimony of other accomplices or the accomplice himself. (*People v. Davis* (2005) 36 Cal.4th 510, 543 (*Davis*).) Section 1111 reflects the Legislature's determination that because accomplice testimony poses reliability questions, it is, without additional evidence, insufficient as a matter of law to support a conviction. (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128; *People v. Romero and Self* (2015) 62 Cal.4th 1, 32.) In that way, section 1111 is an exception to the substantial evidence rule that the testimony of one witness may be sufficient to support a conviction. (*Ibid*.)

The corroborating evidence, however, need not substantiate every fact to which the accomplice testifies. (*Davis*, *supra*, 36 Cal.4th at p. 543;

12

*People v. Perez* (2018) 4 Cal.5th 421, 452.) The entire conduct of the parties, their relationship, acts, and behavior may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration. The evidence need not independently corroborate every fact to which the accomplice testifies, and " " "may be circumstantial or slight and entitled to little consideration when standing alone." " " (*People v. Dalton* (2019) 7 Cal.5th 166, 245–247 (*Dalton*).) " 'Corroborating evidence . . . 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]' " (*People v. Lewis* (2001) 26 Cal.4th 334, 370 (*Lewis*).)

" 'The weight to be given to corroborative evidence is for the [fact finder], whose verdict will not be disturbed [on appeal] unless it is clear that on no hypothesis can it stand. If the record discloses evidence apart from that of the accomplice which connects the accused with the crime, an appellate court will inquire no further in determining the sufficiency of the corroborative evidence.' " (*People v. Blackwell* (1967) 257 Cal.App.2d 313, 318 (*Blackwell*).) And, just as with the substantial evidence rule, we will not assess the weight of the corroborating evidence or consider matters of credibility as those are the province of the fact finder. (*People v. Jones* (2018) 26 Cal.App.5th 420, 439.)

## D. Analysis

Here, Walters's primary argument is that the prosecutor did not present sufficient evidence to corroborate Michael M.'s preliminary hearing testimony under section 1111. The People counter that section 1111 is not applicable to a section 1172.6 hearing or that Walters forfeited this argument by failing to object to Michael M.'s testimony both at the preliminary hearing as well as the section 1172.6 evidentiary hearing. In the alternative, the

People argue that Michael M.'s testimony was sufficiently corroborated by Walters's guilty plea.[5]

The People maintain that section 1111 does not apply to an evidentiary hearing under section 1172.6. To this end, they note that subdivision (d)(3) of section 1172.6 states that although the Evidence Code governs evidentiary hearings, "the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." Thus, the People claim that the trial court may consider evidence admitted at prior hearing as long as it remains admissible under current law and "neither the statutory text nor due process require[s] the court to conduct additional analysis." (*People v. Palacios* (2024) 101 Cal.App.5th 942, 955.) However, the People's argument misses the mark. They are focused on the admissibility of Michael M.'s preliminary hearing testimony. Walters does not refute that Michael M.'s testimony was admissible at the section 1172.6 evidentiary hearing. Rather, Walters contends Michael M.'s testimony was insufficient, on its own, to prove his guilt. Accordingly, we do not find the People's argument persuasive on this point.

Next, the People assert that Walters forfeited his challenge to Michael M.'s testimony by failing to object at the preliminary hearing and the section 1172.6 evidentiary hearing. As Walters points out, despite citing numerous cases dealing with forfeiture, the People do not cite to any case applying forfeiture to a claim under section 1111 for a defendant's failure to object to an accomplice's testimony at a preliminary hearing. The reason for

_____

[5] Walters asserts that Michael M. was his accomplice as a matter of law. The People do not argue otherwise. Thus, for purposes of our analysis here, we shall assume that Michael M. was Walters's accomplice and section 1111 applies to Michael M.'s testimony.

the absence of such a case is clear. Section 1111 prohibits a *conviction* based solely on the testimony of a defendant's accomplice. A probable cause hearing merely determines whether a defendant should stand trial for his or her crimes; no determination of guilt beyond a reasonable doubt is made there. Thus, it makes sense that a defendant would not argue, at a preliminary hearing, that the prosecution's evidence does not satisfy section 1111.

Similarly, we are not persuaded by the People's argument that Walters forfeited his section 1111 challenge on appeal by failing to object at the evidentiary hearing. Notably, all the cases on which the People rely involve a failure to object to the admissibility of certain evidence. (E.g, *People v. Huggins* (2006) 38 Cal.4th 175, 236 [claim regarding improper admission of victim-impact evidence forfeited by failure to object]; *People v. Barnes* (2013) 216 Cal.App.4th 1508, 1519 [argument on appeal regarding inadmissible testimony was forfeited by the defendant's failure to object]; *People v. Booker* (2011) 51 Cal.4th 141, 170 [failure to object to crime scene and autopsy photographs admitted at trial forfeited the defendant's claim on appeal that they were inadmissible].) Again, as we discussed *ante*, Walters is not claiming the court admitted evidence that should have been excluded. Instead, he is arguing that the trial court improperly relied on uncorroborated evidence from an accomplice in violation of section 1111. Walters is challenging the sufficiency of the evidence not its admissibility. Therefore, the forfeiture cases on which the People rely are not helpful here. (Cf. *People v. Belton* (1979) 23 Cal.3d 516, 519−522; *People v. Martinez* (1982) 132 Cal.App.3d 119, 127−129.)

Yet, the resolution of this forfeiture issue is not dispositive in the instant action because we conclude that Michael M.'s testimony was

sufficiently corroborated by Walters's guilty plea.[6] During his change of plea hearing, the court asked Walters if he murdered Kristine. He responded, "Yes, I did." The court followed up by asking Walters if he killed Kristine, and Walters admitted, "Yes, I did." Walters's attorney interjected, "It's aiding and abetting," and the court noted, "By what he said is enough." Further, on the guilty plea form, Walters stated that he "aided and abetted the unlawful murder of Kristine . . . and . . . a first degree murder."

Walters attempts to minimize his guilty plea, arguing that it included no specific factual basis for that plea. He then frames the salient issue as a determination of what criminal liability, if any, his guilty plea could establish under current law. However, that is not the critical question here. As we discussed *ante*, evidence corroborating accomplice testimony needs only "connect the defendant with the crime charged." (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1206.) The crime charged was Kristine's murder. Walters pleaded guilty to that murder, representing to the trial court that he killed Kristine. Moreover, his written guilty plea indicated that he pleaded guilty to first degree murder of Kristine as an aider and abettor. As such, the guilty plea form coupled with Walters's statement that he killed Kristine clearly corroborated Michael M.'s testimony implicating Walters in Kristine's murder. It tends to connect Walters to Kristine's murder in such a way that would satisfy the trial court that Michael M. was telling the truth. (See *Lewis*, *supra*, 26 Cal.4th at p. 370.) We do not need to evaluate whether Walters's guilty plea, standing alone, would be sufficient to convict him of Kristine's murder. (See *Dalton*, *supra*, 7 Cal.5th at pp. 245–247.) And because Walters's guilty plea sufficiently connects him to Kristine's murder,

---

[6] We summarily reject the People's contention that Walters's waived any objection to the evidence against him by pleading guilty.

we do not need to inquire any further to determine the sufficiency of that evidence. (See *Blackwell*, *supra*, 257 Cal.App.2d at p. 318.)

Having concluded that Michael M.'s testimony was sufficiently corroborated to satisfy section 1111, we turn now to Walters's alternative argument that, even if we find that his guilty plea corroborates Michael M.'s preliminary hearing testimony, the evidence remains insufficient to allow the trial court to find him guilty of murder. Specifically, he argues that the evidence was insufficient to prove that he acted with malice or that he was a major participant in the underlying felony who acted with reckless indifference to human life. We conclude there is sufficient evidence of Walters's intent to kill to support the trial court's finding of guilt on a direct aiding and abetting theory.

In a section 1172.6 appeal after an evidentiary hearing, we review the trial court's factual findings for substantial evidence. (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125 (*Guiffreda*).) "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*Guiffreda*, *supra*, 87 Cal.App.5th at p. 125.) We must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*Ibid.*) " 'The same standard applies when the conviction rests

17

primarily on circumstantial evidence.'" (*Ibid.*) "'An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence.'" (*Ibid.*)

A person aids and abets the commission of a crime when, with knowledge of the direct perpetrator's intent to commit the crime and with an intent to assist in committing the crime, he in fact assists the commission of the crime. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) The defendant must not only know the direct perpetrator's intent, he must share in that intent. "Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*People v. Canizales* (2019) 7 Cal.5th 591, 602.)

Drawing all reasonable inferences in support of the trial court's order, we conclude there is sufficient circumstantial evidence to support its finding that Walters acted with an intent to kill Kristine.

While mere presence during a crime is insufficient by itself to establish aiding and abetting, it can be considered as one relevant factor, along with conduct before, during, and after the offense. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) We therefore consider the totality of circumstances before, during, and after Kristine's murder.

Here, the preliminary hearing transcript shows that Walters and his cohorts concocted a plan to kidnap anyone in the residence when they went to confront Jay. In accordance with the plan, Walters kidnapped Michael P. and held him and Daniel at gunpoint on various occasions throughout the ensuing days. He witnessed Kristine's abduction at that same time. He personally moved Michael P. and Daniel from location to location. Walters further participated in conversations with the group and reached a decision

18

to kill Kristine for seeing and knowing too much. After making this choice, Walters helped transport Kristine to the house on Euclid. Upon arrival, Walters's co-participants opened the windows to the house, presumedly to allow the fumes and odors from the poison to dissipate. After they left, Walters remained at the house with Martin and Kristine. Then he struggled with Kristine, while she was being killed, and ended up splitting his lip. Walters told his cohorts that Kristine had been killed and had put up a struggle. He later fled to Mexico.

Walters's presence in the house and his actions leading up to the murder demonstrate that he was an aider and abettor with the intent to kill. Soon after the killing, the group closed up the house and left. A few days later, Walters fled to Mexico with the rest of the group. (See *People v. Bonilla* (2007) 41 Cal.4th 313, 329 [flight and failure to aid victim or seek assistance implies a consciousness of guilt].)

Walters also had a motive to kill Kristine. (See *People v. Smith* (2005) 37 Cal.4th 733, 740–741 [motive is probative of intent to kill].) Walters believed that Kristine saw and knew too much. Consequently, Walters and his cohorts felt that it was necessary to kill her and made the decision to do so.

Walters explicitly agreed that Kristine needed to be killed and took affirmative steps to ensure her murder by bringing her to the house where she was poisoned. Kristine injured Walters during a struggle, and Walters told his cohorts that she resisted while she was being poisoned. A reasonable

trier of fact could rationally conclude that Walters aided and abetted in the murder of Kristine with the intent to kill.[7]

DISPOSITION

The order is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

O'ROURKE, J.

KELETY, J.

---

[7] Because we conclude that substantial evidence supports the trial court's finding that Walters aided and abetted the murder of Kristine with the intent to kill, we do not address Walters's argument that substantial evidence did not support the court's determination that he was a major participant in the underlying felony who had a reckless indifference to human life.